# Illinois Official Reports

## Appellate Court

---

### *People v. Boston*, 2018 IL App (1st) 140369

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SYLVESTER BOSTON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-0369 |
| Filed<br>Rehearing denied | December 31, 2018<br>January 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-C6-60650; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Eric Leafblad, Mary P. Needham, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justice Gordon specially concurred, with opinion.<br>Justice Lampkin dissented, with opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant Sylvester Boston was convicted of first degree murder in connection with the fatal stabbing of Steven Moore Sr. (Moore) and sentenced to 50 years' imprisonment. On appeal, defendant contends (1) the admission of preliminary hearing testimony of a key eyewitness violated the confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI) and the Illinois Rules of Evidence, (2) the trial court erred in allowing the State to introduce defendant's prior conviction for possession of contraband in a penal institution, (3) the State's improper comments on defendant's postarrest silence warrant a new trial, (4) defendant was denied his right to a properly instructed jury where the court failed to clarify Illinois law on self-defense in response to a jury note, (5) defendant's right to a unanimous jury verdict was violated where a juror expressly dissented during the polling of the jury, and (6) defendant's trial counsel was ineffective for failing to preserve certain issues for appellate review.

¶ 2 This court initially filed an opinion affirming defendant's conviction. Thereafter, defendant filed a petition for rehearing, arguing that we misapprehended the law when considering the jury polling issue. This court granted the petition, vacated the previous opinion, and requested supplemental briefing from the parties not only in regard to the jury polling issue but also in regard to the alleged prosecutorial misconduct. The parties filed supplemental briefs addressing both issues. Upon review and consideration of those briefs, we continue to affirm the judgment of the circuit court in its entirety.

¶ 3                                    BACKGROUND
¶ 4                                   Pretrial Matters
¶ 5 During a preliminary hearing on June 29, 2006, the State called Grace Sharp, Moore's mother, who testified as follows. On June 24, 2006, she was in her residence on the 14500 block of University Avenue in Dolton with defendant and Moore. Defendant was a friend of Steven Moore Jr. (Steven), Sharp's grandson and Moore's son. Sharp had known defendant since he was a teenager. Defendant had asked to stay with Sharp for a "couple of days" prior to commencing Job Corps. He stayed in an upstairs bedroom in her raised ranch, and 51-year-old Moore lived in the basement.

¶ 6 On the day of the incident, Sharp did not hear any "words of conflict" between Moore and defendant. According to Sharp, "[t]hey were just talking about the job corp [*sic*] and things like that." In the early evening hours, she heard a "ruffling, scuffling noise" coming from the basement "as if kids were wrestling or playing or something." As she headed downstairs toward the basement to direct them to "stop the noise," she heard her son say, "Ma, call the police, call the police." Moore was calling to her but was not screaming.

¶ 7 Sharp initially did not contact the police. She instead went downstairs, where she observed defendant on top of Moore, stabbing him. She pulled defendant by the neck of his shirt but was unable to "pull him off." After defendant made eye contact with Sharp, he continued stabbing Moore. Sharp attempted to strike him with a plastic milk crate. Defendant, however, knocked the crate out of her hand and continued stabbing Moore. She then went upstairs and dialed 911.

¶ 8 On cross-examination, Sharp testified that she was not aware that either Moore or defendant had consumed alcohol. She indicated that her son had previously used drugs but

"didn't anymore." She did not notice any weapon near Moore, testifying, "I wasn't looking around. I was getting [defendant] off of my son." According to Sharp, defendant had reflexively swung at her to "get away or whatever," but she did not recall seeing a knife in his hand. She was scratched but was not cut. Sharp testified that defendant did not attempt to prevent her from returning upstairs.

¶ 9     After Sharp's testimony, the State called Detective Crudup from the Dolton Police Department, who had attended Moore's autopsy. Following the preliminary hearing, defendant was charged by information with two counts of first degree murder.

¶ 10    In September 2013, defendant filed a motion *in limine* to bar the admission of the preliminary hearing testimony of Sharp, who died in 2008. Defendant argued that he would be deprived of his right to confront his accuser because "there was no meaningful cross-examination" of Sharp. Defendant also filed a motion *in limine* to introduce evidence of Moore's violent nature, including his guilty pleas to charges of domestic battery and resisting a police officer. After a hearing, the circuit court denied the motion to bar Sharp's preliminary hearing testimony but permitted the defense to present certified copies of Moore's convictions.

¶ 11    The State filed a motion *in limine* seeking, among other things, to introduce evidence regarding defendant's criminal history for impeachment purposes, *i.e.*, his conviction for possession of contraband in a penal institution.[1] After conducting a balancing test, the trial court concluded that "the probative value does, in fact, outweigh any prejudicial effect." The trial court indicated its willingness to give a "limiting instruction immediately upon the introduction of the certified copy of conviction or if [defendant] is going to front it first if he testifies."

¶ 12                                    Trial Testimony

¶ 13    Steven testified that his childhood home was on University Avenue in Dolton, where he had lived with his brother, Sharp, and Moore. In June 2006, 22-year-old Steven attended school in De Kalb. When he periodically returned to Dolton, he would stay at the University Avenue residence. According to Steven, Moore stayed in the basement.

¶ 14    Steven had known defendant since junior high school, and defendant spent significant amounts of time at Steven's home during their teenage years. At one point, Steven and defendant had a dance group, and they frequently practiced in Steven's basement. Steven characterized defendant's interactions with Moore as "[r]espectful," and he never observed any physical or verbal altercation between the two.

¶ 15    On the weekend of June 17, 2006, Steven had returned to Dolton and observed defendant walking. Steven exited his vehicle and conversed with defendant. According to Steven, defendant "seemed as if he was having some issues." Steven suggested that defendant stay with Sharp and Moore for a couple of days to "clear his head and figure out his next move." The following weekend, Steven hosted a barbecue in De Kalb, where his father and defendant were expected but ultimately did not arrive. After receiving a telephone call from Sharp, who sounded "[v]ery frightened," Steven rushed to Dolton, where he discovered police at Sharp's residence.

---

[1]This court previously affirmed this conviction. See *People v. Boston*, 2016 IL App (1st) 133497.

¶ 16    Steven testified that Moore had been using drugs, up to the time of his death. He described his father's demeanor after drug use as "[t]ypically relaxed" and "[c]alm" and never violent. Prior to the weekend of June 17, 2006, Steven had not seen defendant in two or three years. When asked whether defendant had maintained contact with Sharp and Moore, Steven responded, "Not to my knowledge." On cross-examination, Steven confirmed that defendant had a good relationship with Sharp and called her "Granny." During Steven's time in high school, his father would sporadically stay at the University Avenue residence. Steven testified that he did not know what type of drugs his father used.

¶ 17    Officer Steven Curry of the Dolton Police Department testified that he was on duty with his partner, Officer Timothy McPherson, on the evening of June 24, 2006.[2] Curry was in plain clothes but was wearing body armor with his star. After receiving a call regarding a stabbing, Curry and McPherson drove to the house on the 14500 block of University Avenue. The partners exited their vehicle and walked to an open door on the side of the residence. Upon arriving at the door, Curry observed an elderly woman standing on a landing with stairs leading up to the kitchen and down to the basement. The woman did not speak to Curry.

¶ 18    The officers entered the home and heard "some commotion downstairs." Curry walked in front of McPherson down the stairs. As he reached the bottom of the stairs, Curry observed an "entranceway to the basement but it was covered by a curtain or some kind of partition they had up against it or covering it." Curry testified, "We stopped and we start listening and it sounded like to me somebody was getting stabbed." He described the sound as "a squishing, a repeatedly [*sic*] like a chi, chi, chi, chi." Curry did not hear anyone speaking. He drew his weapon and instructed McPherson to pull back the curtain.

¶ 19    Curry then observed defendant straddled over Moore. Moore was laying on his back and was not moving. Although defendant looked at Curry, he did not speak to the officers. Curry raised his firearm, and defendant "immediately jumped up and ran around an area of the basement where [Curry] couldn't see." Curry testified that "at that point, I told McPherson let's go back upstairs and call him out and that's what we did." Curry and McPherson walked upstairs, returning to "the doorway, halfway in the door, halfway out in the driveway." Another police officer who had arrived, Officer Bankhead, walked downstairs with his firearm drawn. Curry then viewed defendant, who he identified in court.

¶ 20    Bankhead walked up the stairs backwards, with his firearm pointed at defendant. According to Curry, Bankhead "guided" defendant and "told him to come on." Defendant's hands were covered in blood. When Bankhead was able to move out of the way, Curry and McPherson grabbed defendant; Curry opined that defendant "looked like he might run or something." Defendant "fell down inside of the house," and the officers dragged him outside. After defendant "tussled" with the officers "a little bit," they subdued and handcuffed him. Curry testified that he noticed a knife on the ground in the driveway, "[r]ight there" where defendant was placed under arrest. Curry also testified regarding various photographs, including one depicting defendant's sole injury: a cut on his right arm.

¶ 21    On cross-examination, Curry could not recall the number of stabs he heard. When he pulled back the curtain at the bottom of the stairs, Curry neither noticed a weapon in defendant's hand nor directed him to drop any weapon. He also testified that Sharp had a portable oxygen tank but otherwise appeared uninjured.

---

[2]The trial transcript refers to "June 4, 2006." Such reference appears inaccurate.

¶ 22    Dr. Mitra Kalelkar, a retired medical examiner qualified as an expert in forensic pathology, testified that Moore was dead on arrival at the hospital. While performing his autopsy, Kalelkar observed that most of Moore's injuries were "incised wounds," *i.e.*, "a superficial slashing, cutting type of wound that is inflicted with a sharp instrument, such as a knife or a razor blade." She also observed a single stab wound to his chest, on his back, that fatally perforated his right lung and his heart. Moore's other injuries included blunt trauma to his forehead, multiple wounds in and around his eyes and eyelids, human bite marks, and a suction hematoma, *i.e.*, "somebody sucking the skin." Kalelkar characterized certain injuries as possible defensive injuries that Moore may have sustained while attempting to ward off blows.

¶ 23    The assistant state's attorney (ASA) tendered to Kalelkar certain knives recovered from the crime scene. Kalelkar testified that specific knives could have caused particular wounds on Moore's body. She opined that Moore died as a result of the stab wound to his chest and multiple incised wounds and that the manner of death was homicide. A toxicology examination revealed that Moore's blood tested positive for cocaine and "very little" morphine. On cross-examination, Kalelkar testified that cocaine is an "intoxicating compound," and the presence of metabolized cocaine in Moore's system indicated that "he had been taking cocaine for awhile." She also confirmed that it was possible that certain injuries sustained by Moore could have resulted from "getting scratched by a butter knife" while wrestling with another individual. Kalelkar acknowledged that she did not definitively know which knife caused Moore's injuries, although one of the knives shown to her was consistent with his deep stab wound.

¶ 24    A sergeant from the Illinois State Police (ISP) who processed the crime scene testified, in part, regarding the recovery of three knives from the basement and one knife from the driveway. He confirmed that there appeared to be a "struggle" as there was a blood-like substance "on a lot of different places down in the basement."

¶ 25    Two ISP forensic scientists testified regarding the testing of various stains from the knives, the floor, and defendant's clothing using Moore's blood and defendant's buccal sample. Jaime Bartolotta, one of the scientists, testified that he was unable to make comparisons with respect to stains on one of the knives. For a second knife, Moore could not be excluded from the partial human male DNA profile found on the knife blade, whereas defendant could not be excluded from the human male DNA profile found on the handle of the knife. Neither Moore nor defendant could be excluded from the mixture of DNA profiles found on the remaining two knives; Moore was identified as likely the "major profile," or more significant contributor, with respect to one of those knives.

¶ 26    When the bloodstains from defendant's clothing were tested, Bartolotta found a "mixture of two people." The major profile matched Moore. Bartolotta further testified that Moore's profile matched swabs taken from three out of four locations in the residence. Defendant's DNA did not match any of the swabs taken from the residence, although he could not be excluded from one minor type of one of the swabs.[3]

¶ 27    Officer Anthony Bankhead testified that he was in uniform on June 24, 2006, when he responded to a call. After speaking with McPherson and Curry, he entered the house and

_____

[3]With respect to fingerprint analysis, the parties stipulated that "within a reasonable degree of forensic scientific certainty there were no latent impressions suitable for comparison on the four knives."

walked down the stairs to the basement. He observed defendant—who he identified in court—and ordered him to put his hands up. Defendant complied and walked toward Bankhead. Backing up the stairs, Bankhead walked defendant up the stairs to the doorway. Bankhead testified that defendant "had blood on him" and "it looked like it was blood on his hands dripping."

¶ 28 At the landing, Bankhead stepped out of the house and encouraged defendant to "come further out the door." According to Bankhead, defendant fell on the landing and "McPherson and Curry grabbed him by his hand and brought him out of the house and eventually cuffed him." Bankhead recalled that it "wasn't easy to cuff" defendant. Bankhead testified that there was no blood on the landing, stairs, or driveway when he first entered the residence.

¶ 29 The State's next witness was the ASA who had conducted the preliminary hearing. She testified that a preliminary hearing was conducted five days after Moore's death because "it was the practice" to preserve the testimony of elderly or ill witnesses through a preliminary hearing. Sharp's testimony from the preliminary hearing was published to the jury. On cross-examination during the trial, defense counsel asked, "So it's fair to say that much discovery or anything that could have been developed from any investigation for you to decide hadn't been developed yet, is that correct?' The ASA responded, "I don't know what reports were prepared within the five days." A certified death certificate for Sharp was admitted into evidence. At the conclusion of the State's case-in-chief, the trial court denied defendant's motion for a directed verdict.

¶ 30 Defendant testified that he did not complete 11th grade due to the death of his mother. He instead went to barber college and was working as a barber in June 2006. He considered Sharp—who he called "Granny"—to be "like a second mother." Defendant periodically helped Sharp with chores; he testified she moved slowly because she was on an oxygen machine.

¶ 31 On June 23, 2006, defendant went to Sharp's residence. He was leaving for Job Corps in early July and wished to spend time with her and help around the house. He stayed over at her house in an upstairs guest room on the night of June 23. Moore—the father of defendant's friend Steven—and Sharp's grandson, Nicholas, were also in the home. Defendant testified that he had never "really talk[ed] to" Moore and "didn't know him personally."

¶ 32 Defendant was awakened on the morning of June 24, 2006, by the noise Moore was making when he was "fumbling" and "messing with" his bags. Defendant's bags contained clothing and his professional clippers. Defendant told Sharp what had transpired earlier and then proceeded to prepare breakfast for her. While he was cooking, Moore came upstairs behind defendant. Defendant testified, "He told me you going to do what I want to you do [sic], you're going to give me what I want[.]" Defendant characterized Moore's tone as "mildly aggressive," and defendant "shielded" himself after Moore's remarks.

¶ 33 Sharp then asked defendant to inspect her vehicle and check the fluids. While defendant worked on the vehicle, Moore instructed defendant to move, pushed him, and stated, "I don't need you to do anything." Defendant testified that he felt "kind of shocked" and "rejected." After defendant again spoke with Sharp, she and Moore "got into an altercation" regarding the keys of the vehicle. According to defendant, Moore took the keys from his mother's hands and "told her to give it to him."

¶ 34 Defendant also observed Moore shoving Sharp. As defendant picked up the telephone to dial 911, Moore "snatched" the telephone and took it downstairs into the basement. Defendant decided to "leave out so to let the tension calm down rather than to get into what was going on

with [Moore] and [Sharp]." Defendant went to the basement to retrieve clothes from the washing machine.

¶ 35    As defendant gathered his clothes, Moore ran upstairs to the kitchen. Upon returning to the basement, Moore swung a knife at defendant. Defendant raised his hands to "shield it and block it." A photograph of a stab wound on defendant's right arm under his lower wrist was published to the jury, and defendant displayed the mark on his wrist to the jury. Defendant testified that the two then "got into a tussle."

¶ 36    Defendant testified that he cut his own hand as he grabbed the knife from Moore's hand. According to defendant, after he took one knife, Moore pulled out another knife. Defendant did not know from where Moore retrieved the second knife. Defendant grabbed the second knife from Moore. While defendant held him down and the two struggled, Moore grabbed defendant in his groin area. Defendant described his pain as "excruciating." Defendant bit Moore two or three times to force him to release the pressure on defendant's testicles.

¶ 37    Defendant testified that Moore kept aggressively "charging" at him. Moore had a third knife, which defendant again wrestled away from him. Defendant then used the knife to "protect" and "defend" himself. Defendant was unable to stop Moore from coming at him. According to defendant, Moore continued to hold a knife.

¶ 38    Sharp came downstairs and stated "stop it" and "break it up." Defendant testified that Moore continued to come after him, attempting to "hit" defendant with the knife. According to defendant, Moore did not acknowledge his mother's presence. Defendant noticed that Sharp returned upstairs. He testified that when the police officers arrived, he complied with their direction to "come up with your hands up." Defendant further testified that he was trying to defend himself, he feared for his life, and he did not intend to kill Moore.

¶ 39    On cross-examination, defendant testified that although he had spent a significant amount of time at Sharp's residence during his years of friendship with her grandson, he had only "seen" Moore "once." Before his stay on June 23 and 24, 2006, he had not been to Sharp's home for approximately 1½ to 2 years and had "seen" Steven once "a couple months ago." Defendant denied speaking with Moore about Job Corps on June 24, 2006. At the time of the stabbing, defendant was 21 years old.

¶ 40    Defendant testified that although his confrontation with Moore regarding the vehicle occurred between 10 a.m. and noon, defendant did not leave at that time. He acknowledged that there were other telephones in Sharp's residence. After Moore took one telephone, defendant did not use another telephone to contact 911. Defendant also testified that Moore shoved his mother *before* defendant went out to check on Sharp's vehicle.

¶ 41    Defendant testified that between 3 p.m. and 4 p.m., he had decided to leave Sharp's residence. He had planned to drive to Steven's home in De Kalb. Defendant then testified that, at 1 p.m. or 2 p.m., Moore offered to "smoke something" with him in the basement. Defendant declined and started gathering his clothes. According to defendant, Moore "came at [him] with a knife" before 3:30 p.m.

¶ 42    During cross-examination, defendant was questioned in detail regarding the physical altercation between him and Moore. On recross-examination, the ASA asked, "When you saw the police, you didn't say to them, 'I had to defend myself,' did you?" Defendant responded, "Actually when I came up—yes, I said that yes."

¶ 43    After defendant's testimony, the defense presented certified copies of Moore's misdemeanor convictions for resisting a police officer and for domestic battery. The State called Curry as a rebuttal witness. Curry testified that defendant was placed under arrest in the driveway area of the 14500 University Avenue residence. When defendant's hands were cuffed, Curry observed that they "were so full of blood" that Curry was unable to determine whether he had sustained any knife wounds to his hands. When Curry observed a "cleaned up" defendant the day after the incident, he did not have any wounds on his palms or on the back of his hands. Curry also testified that defendant did not evidence any limping or other difficulty walking when he walked up the stairs from the basement.

¶ 44    Moore's son Steven was also called as a rebuttal witness. Steven estimated that while he was a freshman in high school, his father and defendant interacted "[a]t least once or twice a week." Steven testified that Moore and defendant "would joke around, hey, Mr. Moore, what's going on, Sylvester, that would pretty much be it." After Steven graduated from high school, he did not witness any interaction between his father and defendant.

¶ 45    After Steven's rebuttal testimony, the trial court read a jury instruction: "Evidence of defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as any evidence of his guilt of the offense with which he is charged." The ASA then presented a certified copy of defendant's conviction for possession of contraband in a penal institution.

¶ 46    During closing arguments, defendant's counsel argued that he acted in self-defense and sought a finding of not guilty. During rebuttal closing argument, the ASA commented on defendant's silence during his interactions with Sharp and the police. The ASA continued to comment on his silence after the trial court overruled a defense objection.

¶ 47    The jury retired at 6:24 p.m. for deliberations after receiving jury instructions. At approximately 8:13 p.m., the trial judge received a note from the jury stating, "Can self-defense be a mitigating factor? (Definition of mitigating factor is unclear on sheet)." After a colloquy between counsels and the court, the trial judge instructed, "you heard the evidence, you have the instructions of law. Please continue to deliberate."

¶ 48    The jury reached a verdict when they reconvened the following morning. The clerk published the verdict: defendant was found guilty of first degree murder. The 12 jurors, including Mr. Greco, signed the jury verdict finding defendant guilty of first degree murder. The trial court inquired whether the defense wished to have the jury polled, and defense counsel responded affirmatively. The trial court then informed the jury, "I'm going to ask the question and the question is: Was this then and is this now your verdict, and all of you will have to answer out loud." According to the original version of the transcript,[4] Greco—the fifth juror polled—responded, "No." The other 11 jurors responded in the affirmative. The trial court then stated, "Okay. Has anyone not been asked that question? Okay. The jury has been polled. I'll enter judgment on the verdict." Neither counsel nor the trial judge questioned or commented upon Greco's response, and the jury was discharged.

¶ 49    Defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. At the hearing, defense counsel argued, among other things, that the admission of the preliminary hearing transcript constituted reversible error. The trial court denied the

[4]As discussed herein, the transcript was subsequently corrected in accordance with Illinois Supreme Court Rule 329 (eff. Jan. 1, 2006).

motion. Defendant was sentenced to 50 years' imprisonment. The trial court denied his motion to reconsider sentence, and defendant filed this timely appeal.

¶ 50                                                    ANALYSIS

¶ 51        Defendant raises six primary challenges on appeal. We address each argument in turn.

¶ 52                            Admission of Preliminary Hearing Testimony

¶ 53        Defendant contends that the admission of Sharp's testimony from the preliminary hearing violated the confrontation clause and Illinois law where the defense did not have a "meaningful" opportunity to cross-examine Sharp. As the Illinois Supreme Court has recognized, the requirement of a prior, adequate opportunity to cross-examine the absent witness "is at once both an evidentiary and *constitutional* requisite for admission of former testimony." (Emphasis in original.) *People v. Torres*, 2012 IL 111302, ¶ 52; see U.S. Const., amend. VI; 725 ILCS 5/115-10.4(d) (West 2012) (providing that a prior statement of a deceased witness that is sought to be admitted pursuant to this section "must have been made by the declarant under oath at a trial, hearing, or other proceeding and been subject to cross-examination by the adverse party").

¶ 54        "[T]he requirements for admission of former testimony are twofold: the witness from the prior hearing must be unavailable at trial and the defendant must have had an adequate opportunity to effectively cross-examine the witness at the prior hearing." *Torres*, 2012 IL 111302, ¶ 53. "[P]rior testimony from a *preliminary hearing* may be admissible at a subsequent trial so long as the two requirements for admission are met." (Emphasis in original.) *Id.* In the instant case, there is no dispute that Sharp was unavailable at the time of trial. The parties' disagreement centers on the second requirement for admission of her preliminary hearing testimony: whether defendant had an adequate opportunity to cross-examine Sharp. "Whether ample opportunity to cross-examine existed must be decided on a case-by-case basis." *People v. Sutherland*, 223 Ill. 2d 187, 273 (2006).

¶ 55        Citing *People v. Barner*, 2015 IL 116949, ¶ 39, defendant contends that claims of evidence admitted in violation of the confrontation clause are "properly reviewed *de novo*." Defendant further asserts that "[w]hether the admission violates Illinois evidence law is reviewed for an abuse of discretion." See *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20 (noting that "[a]s a general rule, a trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed under an abuse of discretion standard"). The State appears to argue that an abuse of discretion standard applies to both the constitutional and evidentiary challenges. We agree. See *Torres*, 2012 IL 111302, ¶ 47 (noting that "constitutional considerations are inextricably intertwined with the question of admissibility"); *People v. Lard*, 2013 IL App (1st) 110836, ¶¶ 15-16 (applying abuse of discretion standard where defendant raised arguments regarding the confrontation clause and Illinois evidence law). "A trial court has abused its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the court's view." *Starks*, 2012 IL App (2d) 110273, ¶ 20. Under either standard of review, however, we reach the same result.

¶ 56        Rule 804 of the Illinois Rules of Evidence provides that testimony given by an unavailable witness is not excluded by the hearsay rule if, among other things, "the party against whom the testimony is now offered *** had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011); see also

*People v. Rice*, 166 Ill. 2d 35, 41 (1995) (noting that "[f]or an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the motive and focus of the cross-examination at the time of the initial proceeding must be the same or similar to that which guides the cross-examination during the subsequent proceeding"). "As our supreme court stated in *Torres*, defense counsel at a preliminary hearing may not have all the information discovery may later disclose; what matters is that defense counsel had a 'fair opportunity' to inquire into a witness's observation, interest, bias, prejudice, and motive." *Lard*, 2013 IL App (1st) 110836, ¶ 21 (quoting *Torres*, 2012 IL 111302, ¶ 66).

¶ 57      Defendant contends that, in his case, "the motive and focus differed because the central question at the preliminary hearing—was there enough evidence that [defendant] killed Moore to bind him over for trial?—was far removed from the questions ultimately before the jury— did [defendant] act in self-defense, whether reasonable or not, when he killed Moore?" Under the circumstances of this case, however, we do not view the motive and focus of the preliminary hearing as "far removed" from defendant's theories at trial. "The purpose of a preliminary hearing is to determine probable cause that a crime has been committed by the defendant so as to warrant further proceedings." *Id.* ¶ 18. "However, the questioning of witnesses in a preliminary hearing and at trial focus on the same issue, namely, 'whether the evidence supports a finding that the defendant committed the charged crime.' " *Id.* (quoting *Torres*, 2012 IL 111302, ¶ 59); *cf. People v. Brown*, 374 Ill. App. 3d 726, 734 (2007) (holding that defense counsel did not have a similar motive for cross-examining the victim at the defendant's bond hearing as he would have had for cross-examination at trial).

¶ 58      Defendant argues on appeal that there was "no incentive to develop the facts that might ultimately lead the jury to a verdict of second-degree murder" and that "futilely press[ing] the self-defense theory" would have provided the State a "dry run" at the case. In the instant case, defense counsel cross-examined Sharp regarding a variety of issues aligned with the self-defense theory ultimately asserted by defendant at trial. For example, defense counsel questioned Sharp regarding, among other things, whether defendant and Moore consumed alcohol, whether Moore used drugs, Sharp's ability to hear a conversation between defendant and Moore prior to their physical confrontation, and her understanding of defendant's whereabouts prior to the altercation.

¶ 59      Defendant contends that, "[h]ad Sharp's testimony come at trial," she would have been questioned regarding "the escalating tension and disputes between [defendant] and Moore throughout the day." Sharp testified during direct examination, however, that she did not hear any conflicts between defendant and her son throughout the day on June 24, 2006. She again answered during cross-examination that she heard "nothing" prior to hearing the two men wrestling in the basement. Although defense counsel had an opportunity and motive to inquire regarding possible conflict earlier in the day—as counsel would have presumably done at trial—Sharp's responses suggest that she was unaware of "the escalating tension and disputes."

¶ 60      The Illinois Supreme Court in *Torres*, 2012 IL 111302, ¶ 60, held that, depending on the circumstances, "the motive-and-focus test cannot be our *sole* guide to a resolution." (Emphasis in original.) Our supreme court also considered whether the defendant had the benefit of unlimited cross-examination at the prior proceeding. *Id.* ¶ 61. In the instant case, defense counsel asked Sharp 34 questions. There is no indication in the record that the court placed any time constraints or other limitations on counsel's ability to cross-examine Sharp. We note that the court sustained the State's sole objection to a question posed by defense counsel: "And as

far as you know, had Sylvester been washing his clothes in that area?" Given Sharp's earlier testimony that she thought defendant was in her living room—and in the context of the remainder of the cross-examination—we do not view the sustained objection as having curbed defense counsel's questioning in any significant manner.

¶ 61 The *Torres* court further observed that "what counsel *knows* while conducting the cross-examination may, in a given case, impact counsel's ability and opportunity to effectively cross-examine the witness at the prior hearing." (Emphasis in original.) *Id.* ¶ 62. Although defendant accurately observes that certain evidence was "undisclosed" at the time of the preliminary hearing, we do not share his view regarding the impact of such incomplete discovery.

¶ 62 For example, defendant notes that the toxicology report that established Moore's drug use shortly before his death was not available until the spring of 2007, months after Sharp's testimony in June 2006. During cross-examination, Sharp acknowledged that her son previously used drugs but testified that "he didn't anymore." Although defense counsel presumably would have pressed Sharp on this response if counsel had then received the toxicology report, the fact remains that Sharp apparently believed—albeit incorrectly—that her son no longer used drugs. We further note that the jury heard the medical examiner's trial testimony regarding the presence of cocaine and morphine in Moore's blood, which concretely refuted Sharp's mistaken, but presumably candid, response.

¶ 63 Defendant also contends that Sharp's description of defendant "stabbing and stabbing" Moore "did not match up with the medical evidence, where the medical examiner described a single fatal stab wound to Moore's chest, but several other, 'incised,' slashing wounds." Defense counsel had the opportunity during the preliminary hearing, however, to cross-examine Detective Crudup, who had attended the autopsy. During cross-examination of Crudup, defense counsel asked, in part: "And you said that the cause of death was a stab wound to the chest; is that correct?" Crudup answered affirmatively. Nothing in the record indicates that defense counsel's cross-examination of Crudup regarding the autopsy was constrained in any respect. But *cf. id.* ¶ 64 (opining that "it is clear from the record that counsel would have done more with the witness at the preliminary hearing if he had felt free to do so").

¶ 64 Defendant cites *Starks*, 2012 IL App (2d) 110273, wherein the defendant was convicted of aggravated criminal sexual assault and other offenses. Approximately 20 years after the original trial, the appellate court reversed the trial court's dismissal of the defendant's postconviction petition and remanded the cause for a new trial. *Id.* ¶ 3. Prior to the commencement of the retrial, the complainant died. *Id.* ¶ 16. The trial court then granted the defendant's motion *in limine* to preclude the admission of the complainant's prior testimony. *Id.* ¶¶ 16-18.

¶ 65 In affirming the judgment of the trial court, the *Starks* appellate court noted, in part, that the "defendant did not have an adequate opportunity or similar motive to cross-examine complainant" because the defendant had been "provided with incorrect serology test results, did not know about the exculpatory DNA tests, and, based on the 'offensive use of the rape shield statute,' was improperly barred from asking complainant about her prior sexual contact." *Id.* ¶ 28 (quoting *People v. Starks*, 365 Ill. App. 3d 592, 600 (2006)). The court thus concluded that "the inability of defendant to cross-examine complainant regarding her prior sexual conduct or the exculpatory DNA and serology test results precluded defendant from exposing facts from which the fact finder could have drawn inferences about complainant's reliability and credibility." *Id.* Unlike in *Starks*, the record in this case does not suggest defense counsel's

questioning of Sharp was limited by the court or that counsel was provided any incorrect or misleading information. As our supreme court has observed, " 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *People v. Harris*, 123 Ill. 2d 113, 144-45 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)); see also *People v. Williams*, 139 Ill. 2d 1, 19 (1990) (noting that "effective advocacy is not measured by the number of objections raised or the number of pages of cross-examination").

¶ 66    Defendant further argues that the proper method for the State to preserve Sharp's testimony was an evidence deposition in accordance with Rule 414 of the Illinois Supreme Court Rules. Rule 414(a) provides:

> "If it appears to the court in which a criminal charge is pending that the deposition of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of hearing or trial, the court may, upon motion and notice to both parties and their counsel, order the taking of such person's deposition under oral examination or written questions for use as evidence at a hearing or trial." Ill. S. Ct. R. 414(a) (eff. Oct. 1, 1971).

Defendant has not provided any support for the proposition that Rule 414(a) provides the *sole* proper method for preserving Sharp's testimony. Furthermore, based on defendant's own testimony that "Granny" moved slowly because "she was on an oxygen machine," her advanced age and poor health appears to have been readily apparent. We are unaware of any reason that the *defense* could not have sought an evidence deposition of Sharp prior to her passing in 2008.

¶ 67    We also view defendant's reliance on *People v. Weinke*, 2016 IL App (1st) 141196, as misplaced. In *Weinke*, the trial court granted the State's request for a Rule 414 deposition of the 77-year-old alleged victim—who claimed her son pushed her over a railing—after the ASA represented that she might not survive an impending surgery. *Id.* ¶¶ 1, 2, 10. At the defendant's bench trial, the State offered the evidence deposition as evidence, which was admitted by the trial court, and the defendant was convicted of first degree murder. *Id.* ¶¶ 25, 28. The *Weinke* appellate court found, in part, that the ASA had misrepresented the nature and extent of the deponent's injuries. *Id.* ¶ 51. The appellate court opined, "In these circumstances—where the State is making an extraordinary request and [defense] counsel is at an extraordinary disadvantage—granting the deposition without proof was reversible error." *Id.* ¶ 53. In the instant case, unlike in *Weinke*, defendant does not suggest that the ASA made any express misstatements or misrepresentations that influenced the existence or conduct of the preliminary hearing. Furthermore, the *Weinke* evidence deposition was taken within hours of the court hearing, leaving defense counsel with no time to review the documentation provided by the State or view the crime scene. *Id.* ¶¶ 61-63. While the preliminary hearing in this case occurred five days after Moore's death, there is no indication that defense counsel lacked an opportunity to visit the crime scene or otherwise learn the key available facts.

¶ 68    Finally, after reviewing the trial court's comments during the hearing on defendant's motion *in limine* to bar Sharp's preliminary hearing testimony, the trial court appears to have thoroughly and thoughtfully reviewed the hearing transcript and considered defendant's arguments. We neither view the trial court's decision as "arbitrary, fanciful, or unreasonable"

- 12 -

nor find that "no reasonable person would take the court's view." *Starks*, 2012 IL App (2d) 110273, ¶ 20. The trial court did not abuse its discretion in admitting Sharp's testimony from the preliminary hearing.

¶ 69                                    Introduction of Prior Conviction

¶ 70        Over defense objection, the State was permitted to introduce defendant's conviction for possession of contraband in a penal institution. See 720 ILCS 5/31A-1.1(b) (West 2010). Defendant contends on appeal that, "[u]nlike most offenses in the Criminal Code, a conviction for possession of contraband in a penal institution informs the jury that the accused was incarcerated at the time of his conduct." He thus asserts that "its admission carries a uniquely acute kind of unfair prejudice akin to telling jurors that the accused is currently jailed."

¶ 71        The State initially responds that defendant forfeited this claim by failing to include it in his posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) (noting that "[t]o preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion"). Rule 615(a) of the Illinois Supreme Court Rules provides, in part, that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). The "plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant argues that "[b]ecause this was a closely balanced case where the accused's credibility was at issue, this Court should not enforce any forfeiture," *i.e.*, defendant invokes the "first prong" of plain-error review. See *Thompson*, 238 Ill. 2d at 613.

¶ 72        We begin plain-error review by determining whether there was, in fact, an error. See *id.* Pursuant to *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971), evidence of a witness's prior conviction is admissible to attack his credibility where: "(1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment, (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later, and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice." *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999); see Ill. R. Evid. 609(a) (eff. Jan. 1, 2011) (noting that the court must determine "that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice"). When reviewing a trial court's decision to admit a defendant's prior conviction for impeachment purposes, we apply an abuse of discretion standard. See *Atkinson*, 186 Ill. 2d at 463; *People v. Williams*, 173 Ill. 2d 48, 81 (1996).

¶ 73        In the instant case, there is no dispute that the first two prongs of the *Montgomery* test were satisfied. See, *e.g.*, *People v. Mullins*, 242 Ill. 2d 1, 17 n.2 (2011). The last prong "requires the trial judge to conduct a balancing test, weighing the prior conviction's probative value against its potential prejudice." *Atkinson*, 186 Ill. 2d at 456. "In conducting this balancing test, the trial judge should consider, *inter alia*, the nature of the prior conviction, its recency and similarity to the present charge, other circumstances surrounding the prior conviction, and the length of

the witness' criminal record." *Id.* The evidence of the prior conviction must be excluded if the trial judge determines that the prejudice outweighs the probative value of admitting the evidence. *Id.*

¶ 74 As noted in our earlier decision, the indictment in case number 10 CR 14728 alleged that defendant possessed a shank that was discovered in his waist band while in the Cook County Department of Corrections. *Boston*, 2016 IL App (1st) 133497, ¶ 1. Defendant was found guilty and sentenced to five years' imprisonment. *Id.* During the hearing on the State's motion *in limine* to introduce this conviction, the court and counsel engage in an extended colloquy regarding, among other things, the exact name of the offense. After determining that the charge was "possession of contraband in a penal institution," the court stated, in part:

> "Okay. Well, you know, that's a lot different than possession of a shank, particularly when the defendant is charged with a stabbing here. I mean, because then I would agree [defense counsel] has a pretty strong argument that this could be considered by the jury for propensity purposes.
>
> Contraband is kind of a generic term. They could envision someone being caught with marijuana or some type of paraphernalia in the institution. Obviously, if you are seeking to introduce it as possession of a weapon—contraband; to wit, knife or weapon, then I believe the *** prejudicial effect would outweigh any probative value."

Prior to granting the motion, the trial court observed:

> "This is one conviction. This is not several convictions. This is not for a crime that's similar, as I am told, to the charge against defendant. I do believe the probative value of allowing that outweighs any prejudicial effect."

¶ 75 Based on our review of the record, the trial court engaged in a balancing test and properly considered the factors set forth by our supreme court. See, *e.g.*, *Atkinson*, 186 Ill. 2d at 456. The trial court also issued a limiting instruction prior to the State's presentation of defendant's conviction. "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. See, *e.g.*, *Mullins*, 242 Ill. 2d at 16 (noting that the similarity to the charged crime did not mandate exclusion of a prior conviction, "especially *** when the jury is instructed to consider the evidence of the defendant's prior convictions for the limited purpose of impeachment, which ensures that the jurors understood the narrow reason for which the convictions were admitted").

¶ 76 Defendant nevertheless contends that a "robust body of law condemns such evidence suggestive of past criminality or jailing." We initially observe that *any* prior conviction is suggestive of past criminality. In any event, the cases defendant cites in support of this proposition are distinguishable from the instant case. For example, in *People v. Nelson*, 193 Ill. 2d 216, 224 (2000), the jury was "informed in a not-so-subtle manner that defendant had had mug shots taken on three different occasions, with enough time in between to affect how he looked in the photos." The trial testimony also "implied that the most recent photograph was taken at a time proximate to the commission of the underlying incident." *Id.* In holding that the admission of the mug shot evidence was reversible error, our supreme court opined that "jury speculation as to what might have led to three separate arrests (including one near the time of the underlying crime) could have been the difference between conviction and acquittal." *Id.* at 224-25.

- 14 -

¶ 77 Unlike in *Nelson*, the trial court in the instant case explicitly considered that defendant had a single prior conviction. Furthermore, we view the State's presentation of a certified copy of defendant's conviction—together with a limiting instruction—as substantially different from the potentially inflammatory mug shot evidence of the defendant provided to the jury in *Nelson*. We also reject defendant's comparison of the court's admission of defendant's prior conviction as akin to forcing a defendant to wear shackles or prison attire in court. See, *e.g.*, *Deck v. Missouri*, 544 U.S. 622, 624 (2005); *Estelle v. Williams*, 425 U.S. 501, 504 (1976); *People v. Boose*, 66 Ill. 2d 261, 268 (1977). Based on the foregoing, we conclude that the trial court did not abuse its discretion in permitting the State to introduce defendant's conviction for possession of contraband in a penal institution.

¶ 78                              Rebuttal Closing Argument

¶ 79 Defendant next contends that his conviction should be reversed and the cause remanded for a new trial because the State improperly commented during rebuttal closing argument on his postarrest silence. Defendant acknowledges that he did not preserve this error for review, but maintains that under both prongs of the plain-error doctrine the matter warrants reversal. To that end, defendant maintains that the evidence was not closely balanced and that the prosecutor's improper remarks deprived him of his substantial right to a fair trial. The State responds that no error occurred because the majority of the comments were directed at defendant's silence prior to his arrest. The State further contends that the error, if any, did not rise to the level of plain error.

¶ 80 We again engage in plain-error review, as defendant failed to include this issue in his posttrial motion. See, *e.g.*, *Thompson*, 238 Ill. 2d at 611-12. As previously observed, defendant has the burden of establishing either that "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear and obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. As noted above, we must initially consider whether an error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 81 Generally, a prosecutor is given wide latitude in closing arguments, although his or her comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. *People v. Page*, 156 Ill. 2d 258, 276 (1993). "The prosecutor has the right to comment on the evidence and to draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant." *People v. Simms*, 192 Ill. 2d 348, 396 (2000). "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial." *Id.* "In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). "Prosecutorial misconduct warrants reversal only if it 'caused substantial prejudice to the defendant, taking into account the content and context of the comment[s], its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Love*, 377 Ill. App. 3d 306, 313 (2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 115 (2003)). "If the jury could have reached a contrary verdict had the

improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123.

¶ 82  Although defendant contends "improper commentary on an accused's silence is to be reviewed *de novo*" (*e.g.*, *People v. Dameron*, 196 Ill. 2d 156, 162 (2001)), this court has "noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments" (*People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39). Such confusion "originates from our supreme court's apparent conflicting holdings" in *Wheeler* (applying *de novo* standard) and *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (employing an abuse of discretion standard). *Johnson*, 2015 IL App (1st) 123249, ¶ 39. We need not resolve the issue, however, because we reach the same conclusion under either standard.

¶ 83  We begin our consideration of the claimed error with a historical overview of the law in Illinois regarding the prohibition of the use of pre-*Miranda* silence, including the silence following a defendant's arrest but before receiving *Miranda* warnings, as stated in this court's opinion *People v. Quinonez*, 2011 IL App (1st) 092333:

"[T]he United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 617-20 (1976), that it was a violation of the due process clause of the fourteenth amendment for the State to impeach a defendant using evidence that defendant was silent following his arrest, after he was advised of his *Miranda* rights. The Court reasoned that since the *Miranda* warnings carry the implicit assurance that his silence will carry no penalty, it would be fundamentally unfair to allow a defendant's post-*Miranda* silence to impeach his trial testimony. *Doyle*, 426 U.S. at 612, 618. However, the Supreme Court later held that the prohibition applies only to a defendant's silence after being advised of his *Miranda* rights. *Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (*per curiam*). In doing so, it found that states were free to formulate their own rules with respect to [a] defendant's silence before arrest [citation], as well as after arrest but before receiving *Miranda* warnings [citation]." *Quinonez*, 2011 IL App (1st) 092333, ¶ 25 (citing *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980), and *Fletcher*, 455 U.S. at 607).

See also *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 84  In this case, defendant does not argue that the prosecutor's rebuttal arguments referenced defendant's silence after he received his *Miranda* warnings. Accordingly, federal constitutional law prohibiting the State from impeaching defendant by referring to his silence at that point in time is not invoked. See *Quinonez*, 2011 IL App (1st) 092333, ¶ 26. What is at issue are the comments made by the prosecutor prior to defendant receiving his *Miranda* warnings. Illinois evidence law prohibits impeachment of a criminal defendant with his or her postarrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings. *Id.* (citing *People v. Clark*, 335 Ill. App. 3d 758, 762-63 (2002)). As set forth by our supreme court in *People v. Lewerenz*, "an accused is within his rights when he refuses to make a statement [at the time of his arrest], and the fact that he exercised such right has no tendency to prove or disprove the charge against him, thus making evidence of his refusal neither material or relevant to the issue being tried." *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962) (citing *People v. Rothe*, 358 Ill. 52, 57 (1934)). "The language of relevancy and materiality utilized by our supreme court in *Lewerenz* and *Rothe* indicates that the Illinois rule which prohibits impeachment with defendant's postarrest silence is based on evidentiary principles, rather than constitutional law. [Citation.] Therefore, the rule is unaltered by federal

- 16 -

constitutional cases which found that the use of a defendant's postarrest, pre-*Miranda* silence does not violate due process." *Quinonez*, 2011 IL App (1st) 092333, ¶ 26. Accordingly, "the Illinois evidentiary rule generally prohibits impeachment of a criminal defendant with his postarrest silence, regardless of whether it occurred before or after he was given *Miranda* warnings, because under those circumstances, that silence is not considered relevant or material." *Id.* ¶ 27. Such references are improper because they are "intended to invite the jury to infer from the defendant's silence that his *** defense is a recent fabrication." *People v. Ridley*, 199 Ill. App. 3d 487, 492 (1990). A prosecutor's comments on prearrest silence, however, are proper. See *People v. Manley*, 222 Ill. App. 3d 896, 909 (1991); *People v. Graves*, 142 Ill. App. 3d 885, 890 (1986).

¶ 85    With this law in mind, we now turn to consider the statements made by the ASA during rebuttal closing argument:

> "The defendant doesn't say to her, I mean, you know, in his lie, but in reality, he never says I need help, and, in fact, the police told you that when Curry comes with McPherson, the defendant says nothing. If you're killing someone in self-defense, aren't you shouting it from the toppist [*sic*], highest mountain you can find. Wait a minute, thank God you're here[.]"

After the court overruled a defense objection, the prosecutor stated:

> "Drop the knife, police, I was attacked, it's not what it looks like, I have blood on me, it's not—I'm cut, I was defending myself, I was attacked, he attacked me. He said nothing to the police. He runs in the back, and then Lieutenant Bankhead comes, and he comes out, and he's got his hands up, does he say then, listen, it's a mistake, I am not the one, I am a victim, I was attacked, I had to do it, or to granny, call an ambulance, this is a horrible event. Yeah, if you were truly justified, if you were truly not guilty, that's what you would do, and that's not what he did, and that's how you know."

¶ 86    These comments can be broken down to reference three distinct periods in time: (1) when Sharp appeared in the basement; (2) when Curry and McPherson came in contact with defendant; and (3) when Bankhead was on the basement stairs. Therefore, in order to determine whether the prosecutor's comments were improper, we must first determine at what point defendant was arrested. See *Quinonez*, 2011 IL App (1st) 092333, ¶ 30.

¶ 87    "An arrest occurs when a person's freedom of movement is restrained by physical force or a show of authority." *People v. Surles*, 2011 IL App (1st) 100068, ¶ 23. Factors that may be indicative of an arrest include "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *People v. Luedemann*, 222 Ill. 2d 530, 553 (2006). We determine whether a person is under arrest based on whether an objective reasonable person, innocent of any crime, would conclude that he is not free to leave under the circumstances. *Id.* The record here demonstrates that defendant was not arrested until Bankhead pointed his weapon at defendant, commanded defendant to ascend the staircase, and guided defendant up the staircase while continuing to point his weapon at defendant. Although Bankhead was the only officer on the stairs at that time, defendant was aware of the presence of at least three officers on the scene. In addition, Bankhead approached defendant with his weapon drawn, gave defendant an order to come with him up the stairs, and continued to point his weapon in defendant's direction as they ascended

the stairs. Under the totality of these circumstances, we conclude that any interaction defendant had with police officers from that point forward is considered postarrest.

¶ 88 Thus it follows that the prosecutor's comments regarding the points in time prior to defendant's arrest by Bankhead were proper. While Curry and McPherson did enter the basements with their weapons drawn, upon viewing them defendant retreated. See *People v. Beall*, 42 Ill. App. 3d 452, 454 (1976) (the defendant's flight after he was confronted by police officers who informed him he was "under arrest" contradicted any claim of submission to arrest); *People v. Tribett*, 98 Ill. App. 3d 663, 672 (1981) ("the fact that the officers had their guns drawn does not necessarily indicate an arrest"). The officers' intent not to arrest defendant at that time was evident when Curry and McPherson decided to exit the basement without confronting defendant further. See *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006) (one factor to consider to determine whether a defendant is arrested includes the intention of the officers). At this point, the totality of the circumstances indicates that defendant was not arrested; in fact, there was no evidence presented there was an arrest affected at that time by Curry and McPherson. It also goes without saying that when Sharp descended the basement stairs defendant was not under arrest, as the police had not even been called at that time. Thus, the prosecutor's comments regarding defendant's silence during these two periods of time were proper.

¶ 89 Regarding the prosecutor's comment on defendant's silence after his arrest, the State maintains that the comment falls within one of the exceptions to the general rule that postarrest silence is considered irrelevant and immaterial and thus it was proper.

¶ 90 Illinois courts have held that there are two exceptions to the general rule, where postarrest silence will be considered relevant. See *People v. McMullin*, 138 Ill. App. 3d 872, 877 (1985). A defendant's postarrest silence may be used to impeach his trial testimony when (1) the defendant testifies at trial that he made an exculpatory statement to the police at the time of his arrest or (2) the defendant makes a postarrest (pretrial) statement that is inconsistent with his exculpatory trial testimony. *Quinonez*, 2011 IL App (1st) 092333, ¶ 27.

¶ 91 Despite the State's request, we decline to consider whether defendant's postarrest silence falls within one of the exceptions to the general rule. First, the facts of this case are nuanced, and the State cites no case wherein it was allowed to impeach a defendant with his or her silence where the State itself elicited the testimony it purports to impeach. See Ill. S. Ct. R. 341(h)(7), (i) (eff. May 25, 2018). Second, even if it did not fall within one of the exceptions, defendant cannot demonstrate plain error.

¶ 92 Regarding first-prong plain error, defendant asserts that the evidence was closely balanced where the jury had before it sufficient evidence that he acted in self-defense and thus could have found him guilty of second-degree murder. Defendant points to his testimony that he acted out of "fear[ ] for his life" and that he "slashed at" Moore to protect and defend himself. Defendant further notes that the State failed to offer any eyewitness testimony regarding how the fight ensued and thus his testimony that Moore attacked him first was unrebutted. This evidence, along with the evidence of Moore's criminal record and the presence of cocaine in his system at the time of the fight, could lead a jury to conclude that he acted in self-defense.

¶ 93 Where a defendant claims first-prong plain error, a reviewing court must decide whether the defendant has demonstrated that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice. *People v. Sebby*, 2017 IL 119445, ¶ 51. If the defendant carries that burden, prejudice is not presumed; rather, "[t]he error is actually

prejudicial." *People v. Herron*, 215 Ill. 2d 167, 193 (2005); accord *Piatkowski*, 225 Ill. 2d at 566 ("defendant must meet his burden to show that the error was prejudicial—in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced' "). In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53. A reviewing court's inquiry thus "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 94    Here, defendant was found guilty of first degree murder under section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 2006)). That section provides:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another[.]" *Id.*

¶ 95    Defendant here also raised the affirmative defense of self-defense. Once the affirmative defense of self-defense is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. See 720 ILCS 5/7-1 (West 2006); accord *Lee*, 213 Ill. 2d at 225 (enumerating elements). If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails. *Lee*, 213 Ill. 2d at 225. Of course, the State does not have the burden to disprove an affirmative defense unless sufficient evidence is present on it. *People v. Smith*, 237 Ill. App. 3d 901, 907-08 (1992).

¶ 96    Here, the evidence defendant committed first degree murder was overwhelming. Sharp's testimony established that upon hearing a "scuffling noise" in the basement, she went towards the basement stairs and directed those in the basement to "stop the noise." Sharp further testified her son, Moore, directed her to "call the police, call the police." Instead of calling the police directly, Sharp went downstairs into the basement where she observed defendant on top of Moore, stabbing him. She attempted to pull defendant off of Moore, and at one point attempted to strike him with a milk crate, but she was unsuccessful in stopping the attack. Sharp then went upstairs and dialed 911. Some amount of time passed between when Sharp called 911 and the police arrived, and the evidence established that, when Curry and his partner arrived in the basement, defendant was not only still on top of Moore but was continuing to stab him. See *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42 (intent to kill may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries).

¶ 97    The physical evidence corroborated the State's theory of the case. When defendant was discovered in the basement, Curry and Bankhead testified that they did not recall him holding a weapon. When Bankhead ordered defendant to put his hands up, defendant still was not observed with a weapon. It was not until after defendant resisted being detained by "tussling"

with the officers that a knife was discovered on the driveway "[r]ight there" where defendant was placed under arrest. From this evidence the jury could infer that defendant had hidden at least one knife on his person. The DNA evidence also established that the blood on defendant's clothing and certain of the recovered knives contained Moore's DNA.

¶ 98    In addition, the medical examiner testified Moore suffered numerous incised wounds and one fatal wound as well as blunt trauma to his forehead, multiple wounds in and around his eyes, human bite marks, and a suction hematoma. The medical examiner also testified that some of these injuries were possible defensive injuries that Moore may have sustained while attempting to ward off blows. In contrast, defendant testified he received two knife wounds; one when he raised his arms to initially protect himself and another when he cut his own hand as he grabbed the knife from Moore's hand. The evidence at trial, however, established that defendant only suffered from the one wound to his arm, as Curry testified that the day after defendant was arrested there were no wounds on the palms or on the tops of his hands. The photographs, autopsy results, and medical examiner's testimony revealed Moore's extensive injuries, whereas the photographs of defendant—coupled with Curry's testimony— demonstrated that defendant was almost completely unscathed. In further support that defendant was the aggressor, Bankhead testified that as defendant walked up the basement stairs he observed that defendant's shirt, while blood-stained, was not ripped. Our review of the evidence indicates the evidence against defendant was overwhelming and was not closely balanced, so any alleged errors made by the prosecutor during closing arguments cannot be reviewed under the first prong of a plain error review. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 99    Defendant maintains, citing *Sebby*, that where a defendant's testimonial account was "plausible," the evidence is closely balanced. In *Sebby*, the defendant was charged with resisting a police officer. *Id.* ¶ 54. On appeal before our supreme court, the defendant asserted the trial court committed an Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) violation and that the error rose to the level of plain error under the first prong of the plain-error doctrine. *Id.* ¶ 52. In considering whether the evidence in the case was closely balanced, our supreme court laid out the evidence presented and concluded that it involved a contest of credibility where both the testimony of the State's witnesses and the testimony of defendant and his witnesses were plausible and neither were supported by corroborating evidence. *Id.* ¶¶ 61-63 (citing *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008) ("Given these opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version, the trial court's finding of guilt necessarily involved the court's assessment of the credibility of the two officers against that of defendant.")).

¶ 100    This case does not represent an instance where the evidence turned solely on the credibility of the testimony as it did in *Sebby*. Not only did Curry and McPherson come upon defendant while the act was being committed, there was also physical evidence that demonstrated defendant's involvement in the crime. As discussed above, the State's theory of the case was supported by not only the testimony of its witnesses but by the physical and DNA evidence. In addition, defendant's testimony was inconsistent. Defendant could not accurately recall the timeline of events on June 24, 2006, and his testimony that Moore "came at [him] with a knife" before 3:30 p.m. appears to conflict with the testimony of Officers Curry and Bankhead that the incident was continuing at approximately 6:20 p.m. Furthermore, defendant's repeated denial or minimization of his prior interactions with Moore was contradicted by Steven's

testimony. Accordingly, we conclude that defendant has not carried his burden under the closely balanced prong of the plain-error doctrine. See *id.* ¶ 50.

¶ 101     As to second-prong plain error, defendant sets forth five reasons why "the unfairness of his case rose to the level of a substantial violation" of defendant's due process rights: (1) the State's injection of the issue of silence into trial; (2) its "thin foundation in the evidence actually elicited"; (3) the prosecutor's "repeated and hyperbolic exploitation of silence in rebuttal closing argument imploring jurors to treat Boston's silence as substantive proof of guilt"; (4) the lack of "meaningful corrective action by the court"; and (5) the record's "suggestion that the references to Boston's silence in closing were part of an ambush strategy pursued by the State."

¶ 102     We initially observe that we have not found that all of the reasons put forth by defendant constitute error. Defendant did not frame his argument on appeal as an attack on the impropriety of the State's questioning of him during recross-examination. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (forfeiture). Nor did defendant challenge the admissibility of this testimony. See *id.* Furthermore, as explained previously, not all of the prosecutor's comments regarding defendant's silence were improper. In fact, a majority of those comments went to defendant's prearrest silence. See *Manley*, 222 Ill. App. 3d at 909 (a prosecutor's comment on a defendant's prearrest silence is not error).

¶ 103     Additionally, defendant testified that he was not silent, yet the prosecutor argued otherwise in closing argument. Despite the trial court's failure to sustain the objection by defense counsel that this line of argument was improper, the jury was still advised on multiple occasions that it was only to consider the evidence. "[I]mproper arguments can be corrected by proper jury instructions, which carry more weight than the arguments of counsel." *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011). "Moreover, any possible prejudicial impact is greatly diminished by the court's instructions that closing arguments are not evidence." *Id.* A trial court's instructions that closing arguments are not evidence protect defendant against any prejudice caused by improper comments made during closing arguments. *People v. Quiroz*, 257 Ill. App. 3d 576, 585 (1993). It is presumed that jurors follow the instructions provided by the trial court. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Here, prior to closing arguments, the trial court informed the jury that argument from counsel was not evidence. Subsequently, the trial court provided the jury with Illinois Pattern Jury Instruction No. 1.03, which states:

> "Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Illinois Pattern Jury Instructions, Criminal, No. 1.03 (approved July 18, 2014).

Accordingly, the jury was aware that the prosecutor's statements were not evidence and that they were only to consider the evidence when deciding the verdict.

¶ 104     Defendant cites numerous cases in an attempt to support his position that improper comments by the prosecutor constitute second-prong plain error. See *Blue*, 189 Ill. 2d at 138; *People v. Smith*, 2017 IL App (1st) 143728, ¶ 45; *People v. Jackson*, 2017 IL App (1st) 151779, ¶ 20; *People v. Green*, 74 Ill. 2d 444, 450 (1979); *Dameron*, 196 Ill. 2d at 164. These cases, however, do not support that position. *Blue*, *Green*, and *Dameron* involved the court engaging

in a harmless error analysis while *Smith* and *Jackson* set forth the general proposition that forfeiture is a limitation on the parties and not the reviewing court. Instead, the relevant question here is whether the alleged error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Clark*, 2016 IL 118845, ¶ 42.

¶ 105 We further observe that while defendant states that his substantial right to a fair trial was violated for these five reasons and thus constituted second-prong plain error, defendant fails to offer any argument as to how the complained of error, namely the improper comment of the prosecutor during rebuttal closing argument, was so serious that it challenged the integrity of the judicial process. See *id.*

¶ 106 We do not believe that any alleged error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *Id.* Second-prong plain error is not restricted to the six types of structural error that have been recognized by the United States Supreme Court. See *id.* ¶ 46 (holding that second-prong plain error is not limited to structural error); *Thompson*, 238 Ill. 2d at 609 (stating that the United States Supreme Court has recognized structural error to include "a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction"). But to rise to the level of second-prong plain error, "the error nevertheless must be of a similar kind: an error affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (Internal quotation marks omitted.) *People v. Johnson*, 2017 IL App (2d) 141241, ¶ 51 (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999), quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The claimed error here did not affect the framework within which defendant's trial proceeded, and it did not challenge the integrity of the judicial process. Instead, it merely resulted in inaccurate commentary not based on the evidence. The record discloses that the jury had before it defendant's testimony that he was not silent; indeed in response to the prosecutor's question on recross-examination, "When you saw the police, you didn't say to them, 'I had to defend myself,' did you?" defendant responded, "Actually, when I came up—yes, I said that yes." It is well established that a prosecutor's statements during closing argument are not evidence, and the jury was so advised of this point by the trial court. See *People v. Nicholas*, 218 Ill. 2d 104, 122-23 (2005). Moreover, the comments were limited to rebuttal closing argument, and they "did not add their weight" to any "cloud of prejudice formed by a wider array of prosecutorial misconduct." *Id.* at 123. We conclude defendant has not met his burden to demonstrate the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. See *Sebby*, 2017 IL 119445, ¶ 50.

¶ 107                                                   Jury Note

¶ 108 During deliberations, the jury sent a note to the judge stating, "Can self-defense be a mitigating factor? (Definition of mitigating factor is unclear on sheet)." After a discussion with counsel, the trial court replied, "[Y]ou heard the evidence, you have the instructions of law. Please continue to deliberate." Defendant contends on appeal that "[b]ecause how the jury would consider self-defense in relation to first- and second-degree murder was the decisive issue in the case, the failure to clarify the issue for the jury was reversible, plain error."

¶ 109    Plain-error review is forfeited, however, when the defendant invites the error. See *People v. Patrick*, 233 Ill. 2d 62, 77 (2009) (declining to address the defendant's plain-error claim because he invited any error by submitting the challenged jury instruction); *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001). The State invokes the invited-error doctrine, arguing that defendant "acquiesced" to the trial court's response "because it substantially conveyed the response he proposed."

¶ 110    After reading the jury note to the parties, the following exchange occurred:

"[ASA]: You have the evidence, continue to deliberate.

[DEFENSE COUNSEL]: Or you can instruct them on the law, please continue your deliberations. You have all the evidence and the instructions under the law.

THE COURT: I just want to look at the instructions real quick. We're told if we can answer a question, we should. Let me see if I could refer them to a particular instruction

\*\*\*

THE COURT: I don't know exactly how to answer this. I mean I could refer them to the definition of mitigating factor, but I think they know about it. I mean I don't want to give them an answer that's going to infer a verdict.

[ASA]: I mean you have all the evidence and instructions on the law, please keep deliberating.

THE COURT: I mean the only thing I would say, and I don't know if this is necessary, I understand the standard response, refer them to [Illinois Pattern Jury Instructions, Criminal, Nos. 7.03, 7.05 (4th ed. 2000) (hereinafter IPI Criminal 4th)], definition of murder and definition of mitigating factor.

[DEFENSE COUNSEL]: And what about self-defense?

[ASA]: Which would be [IPI Criminal 4th No. 7.06].

THE COURT: I could refer them to—you're right, I mean I could refer them to [IPI Criminal 4th No. 24-25.06].

[ASA]: I think they're saying they're aware of the instructions, that they're find [*sic*] it confusing.

THE COURT: Well, I find them confusing, and I've been doing this for you know, 30 years I guess. Okay, I will—you heard the evidence, you have the instructions of law. Please continue to deliberate."

¶ 111    Defendant contends, and we agree, that his trial counsel's statements were "somewhat unclear." For example, defense counsel appears to have both suggested additional instructions *and* accepted the State's position that the jury had received the necessary instructions. In the absence of *clear* invited error, we apply plain-error review. See also Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013) (providing that substantial defects in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require"); *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 42 (noting that "Rule 451(c) is coextensive with the plain-error clause of Illinois Supreme Court Rule [615](a)"). Although we are aware that defendant's posttrial motion stated that the trial court had "replied appropriately" to the jury note "and admonished the jury [to] resume deliberations," we do not view such posttrial statements as having "invited" any alleged error that had previously occurred.

- 23 -

¶ 112      Citing *People v. Downs*, 2015 IL 117934, ¶ 15, defendant contends that "[t]he propriety of a court's response to a question of law from the jury is reviewed *de novo*." We note that the *Downs* court cited *People v. Pierce*, 226 Ill. 2d 470, 475 (2007), wherein our supreme court stated: "Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury instructions accurately conveyed to the jury the law applicable to the case, our review is *de novo*." See also *People v. Reid*, 136 Ill. 2d 27, 38-39 (1990) (holding that the circuit court did not abuse its discretion in its response to the jury); *People v. Gray*, 346 Ill. App. 3d 989, 993-94 (2004) (stating the "court's decision to answer or refrain from answering will not be disturbed absent an abuse of discretion" but "[w]hether the court misstated the law" in its response to a jury question "is naturally a question of law" subject to *de novo* review). Although we apply an abuse of discretion standard herein, our result would be the same under *de novo* review.

¶ 113      "Generally, a trial court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *People v. Averett*, 237 Ill. 2d 1, 24 (2010). "This is true even though the jury was properly instructed originally." *People v. Childs*, 159 Ill. 2d 217, 229 (1994); accord *People v. Landwer*, 279 Ill. App. 3d 306, 314 (1996). In the instant case, the jury was provided with Illinois Pattern Instructions (IPI) regarding, among other things, first degree murder, second degree murder, the definition of a mitigating factor, and the use of force in self-defense.

¶ 114      "A trial court may, nevertheless, exercise its discretion to decline answering a question from the jury under appropriate circumstances." *Averett*, 237 Ill. 2d at 24; accord *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 26. "Appropriate circumstances include when the jury instructions are readily understandable and sufficiently explain the relevant law, when additional instructions would serve no useful purpose or may potentially mislead the jury, when the jury's request involves a question of fact, or when giving an answer would cause the trial court to express an opinion likely directing a verdict one way or the other." *Averett*, 237 Ill. 2d at 24.

¶ 115      Defendant contends that "where the court failed to clarify how self-defense can be a mitigating factor, the prejudice to [defendant] was the equivalent of leaving the jury without a second-degree instruction at all, when such an instruction was due." He cites cases wherein the reviewing courts have held that a trial court's refusal to provide a second degree murder instruction may constitute reversible error. *E.g.*, *People v. Washington*, 2012 IL 110283, ¶¶ 58-60; *People v. Edmondson*, 328 Ill. App. 3d 661, 665-66 (2002). Such error, however, did not occur herein. Furthermore, we do not consider the trial court's answer to the jury's note to be the "equivalent" of *no* second degree murder or self-defense instruction.

¶ 116      Our supreme court has stated that an appropriate circumstance for declining to answer a jury question is when "giving an answer would cause the trial court to express an opinion likely directing a verdict one way or the other." *Averett*, 237 Ill. 2d at 24. The trial court in the instant case expressed concern about this very issue. The trial court's comments regarding the "confusing" instructions also suggest its concern that "additional instructions would serve no useful purpose or may potentially mislead the jury." *Id.* "Illinois pattern instructions were 'painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law,' and for that reason, 'the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial and free from argument.' " *People v. Pollock*, 202 Ill. 2d 189, 212 (2002) (quoting *People v.*

*Haywood*, 82 Ill. 2d 540, 545 (1980)). In this instance—where the trial court had provided the relevant IPI—we cannot conclude that it abused its discretion by determining that any additional "clarification" could confuse or sway jurors, particularly where the court explicitly acknowledged its obligation to answer jury questions, if possible.

¶ 117     Even assuming that the trial court committed clear or obvious error in its handling of the jury note, the evidence was not closely balanced under first-prong plain error, for the reasons discussed above. Furthermore, the cases defendant cites regarding second-prong plain error are inapposite.

¶ 118     For example, in *People v. Ogunsola*, 87 Ill. 2d 216, 222-23 (1981), the Illinois Supreme Court concluded that the challenged jury instruction completely omitted a portion of the definition of the crime. In remanding the cause for a new trial, our supreme court observed that "[t]he failure to correctly inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply." *Id.* at 222. Similarly, in *People v. Ulloa*, 2015 IL App (1st) 131632, ¶ 25, the appellate court concluded that "[t]he misstatement of the applicable law here, including a misstatement of the elements of the offense of conspiracy, is a grave error, affecting the fundamental fairness of the trial and the integrity of the judicial process." Unlike in *Ogunsola* and *Ulloa*, the jury instructions in the instant case did not omit a central issue or incorrectly define an offense or defense. But *cf. Cacini*, 2015 IL App (1st) 130135, ¶ 55 (finding that "the trial court's omission of the self-defense instruction on the three offenses before the jury" was "second-prong plain error because the error was of such a magnitude as to have denied defendant a fair trial"). While "fundamental fairness requires that the jury be instructed on the elements of the offense charged" (*People v. Hale*, 2012 IL App (4th) 100949, ¶ 22), the instructions in the instant case satisfied such requirement. We also reject defendant's contention that "the jury was especially likely to be confused where it received the instructions on self-defense in relation to first and second degree murder out of sequence." See, *e.g.*, *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 45 (concluding that "[a]lthough the instructions were not read to the jury in the precise order directed by the drafting committee, the trial court clearly conveyed the applicable law and the proper instructions to the jury").

¶ 119     We thus conclude that there was no plain error *vis-à-vis* the trial court's answer to the jury note. Defendant contends, in the alternative, that his trial counsel was ineffective "for not ensuring the jury's question was properly answered." Under *Strickland v. Washington*, 466 U.S. 668 (1984), "to prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 120     Defendant cites *People v. Lowry*, 354 Ill. App. 3d 760, 762 (2004), wherein the jury question involved the definition of "knowingly." With the agreement of "[a]ll attorneys," the court instructed the jurors: "You have heard the evidence and been instructed on the law. Please keep deliberating." (Internal quotation marks omitted.) *Id.* The appellate court held that defense counsel provided deficient representation by failing to offer the IPI that expressly defines "knowingly" and related terms. *Id.* at 766-67. The appellate court further held that defense counsel's failure "prejudiced defendant regarding an issue critical to the aggravated battery charge and rendered the proceeding fundamentally unfair." *Id.* at 768. Unlike in *Lowry*, there was no additional IPI in the instant case to provide to the jury. Any attempt at elucidation by the trial court regarding whether "self-defense" could be a "mitigating factor" could have

exacerbated any juror confusion. But *cf. People v. Coots*, 2012 IL App (2d) 100592, ¶¶ 53-54 (concluding that defense counsel was ineffective where counsel failed to tender, and the trial court failed to give, two IPI that would have clarified the term "deliver"). Even assuming *arguendo* that defense counsel's performance was deficient, there is no indication that defendant was prejudiced by such performance, *i.e.*, that there was a reasonable likelihood that the result of his trial would be different. See *People v. Hicks*, 2015 IL App (1st) 120035, ¶ 59.

¶ 121                                                    Jury Polling

¶ 122    In his appellate briefs, defendant contends that "[w]here a juror expressly dissented from the guilty verdict during polling and the court failed to question him, [defendant's] right to a unanimous jury verdict was violated." We initially observe that defendant has forfeited appellate review of this claim by failing to object during the trial or assert the claim in a posttrial motion. See *Thompson*, 238 Ill. 2d at 611 (noting that "[t]o preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion"). The plain-error rule, however, bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *Id.* at 613. The first step of plain-error review is determining whether any error occurred. *Id.* For the reasons discussed below, we find no error.

¶ 123    The purpose of a jury poll is to determine whether the verdict has been freely reached and is unanimous. *People v. Wheat*, 383 Ill. App. 3d 234, 237 (2008). "Through a jury poll, jurors may freely assent or dissent to the verdict without the fear, errors, or coercive influences that may have prevailed in the jury's private collective deliberations." *Id.*; see also *United States v. Shepherd*, 576 F.2d 719, 725 (7th Cir. 1978) (noting that "[t]he purpose of affording a right to have the jury polled is not to invite each juror to reconsider his decision, but to permit an inquiry as to whether the verdict is in truth unanimous").

¶ 124    In Illinois, after a guilty verdict is returned but before it is accepted and recorded, a criminal defendant has an absolute right to poll the jury regarding whether each individual agreed with the pronounced verdict. *Wheat*, 383 Ill. App. 3d at 237. The opportunity for jurors to express their assent or dissent to a verdict is basic to our system, which requires unanimity among the jurors, and if any juror dissents from the verdict, it cannot be recorded. *People v. Rehberger*, 73 Ill. App. 3d 964, 968 (1979); see also 725 ILCS 5/115-4(o) (West 2006) (requiring the "unanimous verdict of the jury"); *Martin v. Morelock*, 32 Ill. 485, 487-88 (1863) (stating that a "case is not at an end until the verdict is recorded and the jury discharged, and it would be unjust to record a verdict from which the jury, in the presence of the court, dissent").

¶ 125    In the original version of the transcript of the jury polling, juror Greco answered "[n]o" when asked, "Was this then and is this now your verdict[?]" After oral arguments in this appeal, the State filed in the trial court a "Motion Pursuant to Supreme Court Rule 329 to Make the Record on Appeal Conform to the Truth." The motion provided, in part, that the "transcript regarding Juror Greco's answer to the jury poll is incorrect and must be corrected." The State represented that after Ellen Dusza, the court reporter, reviewed her notes, "she found that the 'no' answer incorrectly reflected Juror Greco's answer which should have been transcribed as 'yes.' " Defendant responded, in part, that the State's motion was facially insufficient because it failed to provide a copy of Dusza's original stenographic notes.

¶ 126    Rule 329 provides, in pertinent part:

"The record on appeal shall be taken as true and correct unless shown to be otherwise and corrected in a manner permitted by this rule. Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof. Any controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth." Ill. S. Ct. R. 329 (eff. Jan. 1, 2006).

¶ 127    During proceedings before the trial court on February 16, 2017, Dusza testified that she used a steno machine to take notes in machine shorthand on the day of the verdict, but did not have an audio recording. Her notes reflected that juror Greco said "no." After an ASA contacted Dusza regarding the jury polling issue on January 19, 2017, she reviewed her notes.

¶ 128    According to Dusza, a juror may respond "no" because he does not understand the question. In such case, the judge or counsel will ask the juror to repeat his answer and the judge will repeat the question. In the instant case, Dusza testified that her notes did not indicate any follow-up or reflect any unusual occurrences. She also testified that she would have written herself a note if "something out of the ordinary" had occurred, but she apparently did not write any note. Dusza believed juror Greco answered "yes," because nothing transpired after his answer. She testified that the "no" answer was her mistake.

¶ 129    During cross-examination, Dusza testified that the combination of keys used to create the word "yes" are on a different row of a steno machine than the key combination for the word "no." She further testified that in her 28 years of court reporting that she had "never had a 'no' go unnoticed." She agreed, however, that "[s]ometimes attorneys don't object." In response to questioning by the court, Dusza also testified that the defense attorney was present when the jury was polled.

¶ 130    An ASA who prosecuted the case against defendant testified that she and her partner were in the courtroom when the jury returned its verdict. Defense counsel objected to the ASA's testimony, arguing that such testimony was not relevant without any kind of documentary evidence. The trial court permitted the ASA to continue to testify. She testified that juror Greco had "said the word 'yes' " when asked "was this then and is this now your verdict."

¶ 131    The judge observed that he was not "looking over somebody else's verdict" but was instead "looking over a verdict that I took myself." He specifically remembered defendant's trial counsel and also recalled specific details of defendant's various proceedings, which were on his call for several years. The judge noted that he was "very cognizant" of his procedure and protocol when conducting jury polling and that he listened clearly when he polled the jury. He also noted that neither he nor any of the attorneys present at the verdict responded to Greco's answer. Finally, the judge found Dusza's testimony to be credible and consistent with his own recollection and the recollection of the ASA. Stating that "common sense should rule," the court concluded that it was clear that "at no time did Juror Greco ever answer no when he was polled." The court granted the State's Rule 329 motion.

¶ 132    In accordance with the trial court's ruling pursuant to Rule 329, the record has been corrected to reflect that Greco's response was "yes."

¶ 133    Defendant has argued in both the trial court and this court that under Rule 329, any alteration that impeaches or contradicts the record must be based on contemporaneously produced documentary evidence, such as the court reporter's stenographic notes. According to

- 27 -

defendant, the testimony of the participants or the recollection of the trial court alone is insufficient. See, *e.g.*, *People v. Allen*, 109 Ill. 2d 177, 184 (1985); *People v. Vincent*, 165 Ill. App. 3d 1023, 1030 (1988) (relying on *Allen*).

¶ 134 We observe, however, that certain principles articulated by the Illinois Supreme Court in *Allen* were derived from cases with significantly different facts than those of *Allen* or the instant case. For example, in *Hartgraves v. Don Cartage Co.*, 63 Ill. 2d 425, 427 (1976), an in-chambers discussion was held after 1 of the 12 jurors was injured and could not continue to serve on the jury. After this off-the-record discussion, the defendant's counsel moved for a mistrial in open court, which the trial court denied. *Id.* In his posttrial motion, the defendant challenged the denial of his motion for a mistrial. *Id.* Prior to the hearing on the defendant's posttrial motion, the plaintiff's counsel submitted an affidavit in opposition to the motion. *Id.* The affidavit stated that during the in-chambers discussion, defense counsel had indicated that he would formally object to proceeding with less than 12 jurors but requested that the judge overrule his objection, and indicated he was willing to proceed with 11 jurors. *Id.* The defendant's counsel submitted an affidavit denying that he had consented to proceeding with less than 12 jurors. *Id.* At the hearing on the posttrial motion six months after the trial, the trial judge stated that he had a clear recollection of the in-chambers discussion. *Id.* The trial judge stated that the defendant's counsel had suggested he overrule the motion for mistrial and agreed that the trial court proceed. *Id.* The trial court denied the defendant's posttrial motion. *Id.*

¶ 135 The Illinois Supreme Court in *Hartgraves* affirmed the judgment of the appellate court, which had reversed and remanded the matter for a new trial. *Id.* at 432. In so holding, our supreme court stated that "any corrections of or additions to the record which contradict the clear and unambiguous contents of the record must be supported by something other than the 'clear memory' of the trial judge." *Id.* Our supreme court noted that there was no disagreement regarding whether the record accurately disclosed what occurred in court. *Id.* at 429.

¶ 136 In *Allen*, 109 Ill. 2d at 184, the Illinois Supreme Court—citing *Hartgraves* and another civil case—stated that "[i]t is well established that a party may not prove an inaccuracy in the record merely by presenting oral testimony." Our supreme court in *Allen* concluded that the trial court's correction of a transcript was proper where, among other things, the State presented the original stenographic notes which supported its contention that the transcript of proceedings was incorrect. *Id.* Although the stenographic notes in the instant case do not support the finding of an inaccuracy as was the case in *Allen*, we do not view Rule 329 as mandating that any alteration that contradicts the record must be based on contemporaneously produced physical evidence.

¶ 137 Approximately one year after the *Hartgraves* decision, the Illinois Supreme Court in *People v. Chitwood*, 67 Ill. 2d 443 (1977), approved a correction of the record based on an affidavit presented by the State and the trial judge's verification of the accuracy of the affidavit. In the affidavit, the State averred that the defendant, through his counsel, waived the right to a jury trial in open court but that waiver was inadvertently omitted from the record. *Id.* at 446. Distinguishing *Hartgraves*, our supreme court held that the State's motion to amend should have been allowed. *Id.* at 448. The Illinois Supreme Court in *Chitwood* stated that the "question in *Hartgraves* was *** not whether the record could be amended, but whether it could be impeached by showing that a party had made an off-the-record representation inconsistent with the position which he assumed in the courtroom as shown by the record." *Id.* at 447-48.

¶ 138    We respectfully submit that the facts of the instant case are more akin to *Chitwood* than *Hartgraves* and that the evidence presented at the Rule 329 proceeding—including the testimony of the court reporter and the ASA and the detailed recollection of the trial judge— was sufficient. Rule 329 is a "sweeping provision" that makes it "possible to supply omissions, correct inaccuracies or improper authentication, or settle any controversy as to whether the record on appeal accurately discloses what occurred at the trial by the procedure that will most appropriately solve the particular problem." Ill. S. Ct. R. 329, Committee Comments (rev. May 1982).

¶ 139    We also find useful guidance in *People v. Rockman*, 144 Ill. App. 3d 801, 811 (1986), wherein the State filed a motion to amend the transcript of a witness's testimony to read "can" rather than "can't" with respect to the witness's ability to see the defendant at the shooting. The trial court granted the motion based upon the judge's personal recollection that the witness had stated "can." *Id.* On appeal, the defendant argued that a court may allow an amendment of the record of proceedings solely based on its own recollection provided that the amendment does not impeach or contradict the record. *Id.* Rejecting this "narrow perspective," the appellate court stated that "the proper perspective is to view the amendment in the context of the entire record to determine if it contradicts the evidence as a whole." *Id.* In affirming the judgment, the appellate court discussed other testimony from the witness that supported the conclusion that he could see the defendant. *Id.* at 811-12. The appellate court also noted the trial court's observation that the witness spoke " 'in a broken tongue,' easily misinterpreted by the court reporter." *Id.* at 812.

¶ 140    As in *Rockman*, the amendment of the record herein "resolves, rather than creates," contradictions. *Id.* at 811. Absent the amendment, the record would reflect that juror Greco signed the verdict form finding defendant guilty, but then disagreed with the verdict during jury polling, yet no one in the courtroom—including the trial judge, the defense attorneys, the ASAs, and any court staff—noticed or reacted in any manner. We further note that the trial court inquired during *voir dire* whether Greco, an immigrant to the United States, "had any trouble with the English language." Such inquiry suggests that Greco—like the *Rockman* witness—may have a distinctive accent that could have been misinterpreted by the court reporter. We find that the correction of the record was not contradictory to the record and the trial court properly granted the motion to correct the record.

¶ 141    For the foregoing reasons, we conclude that there was no error, and thus there was no plain error. See *Thompson*, 238 Ill. 2d at 615. "An appellate issue is moot when it is abstract or presents no controversy." *People v. Brown*, 204 Ill. 2d 422, 425 (2002). The correction of the record to reflect that juror Greco answered "yes" during the jury polling has rendered the jury polling issue moot, and thus we need not consider the issue further. See *id.* (noting that "[a]n issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief"). Finally, the parallel Rule 329 motion filed with this court and taken with the case is hereby denied as moot.

¶ 142                              Ineffective Assistance of Counsel

¶ 143    Defendant contends that his trial counsel "unreasonably omitted three meritorious issues from his [posttrial] motion: the improper use of [his] post-arrest silence, the juror's dissent [from] the verdict, and the improper admission of [his] prior conviction." In determining whether a defendant was denied the effective assistance of counsel, we ordinarily "apply the

- 29 -

familiar two-prong test established in [*Strickland*, 466 U.S. 668]." *Cherry*, 2016 IL 118728, ¶ 24. To prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.*

¶ 144 We have rejected defendant's contentions regarding the State's use of his silence during rebuttal closing argument. We have further concluded that the trial court did not err in admitting defendant's conviction for possession of contraband in a penal institution for impeachment purposes. Defendant's trial counsel was not ineffective for failing to preserve these claims. " 'Defense counsel is not required to make futile motions or objections in order to provide effective assistance.' " *People v. Smith*, 2014 IL App (1st) 103436, ¶ 64 (quoting *People v. Glass*, 232 Ill. App. 3d 136, 152 (1992)); see also *Anderson*, 2012 IL App (1st) 103288, ¶ 53 (stating that "[g]iven that the deviation from the drafting committee's directives *** was not erroneous, it was not objectively unreasonable for defense counsel to fail to address this issue through objection or a posttrial motion"). Furthermore, as discussed above, juror Greco did not dissent from the verdict—as is now reflected in the corrected record—and thus defense counsel was not ineffective *vis-à-vis* jury polling.

¶ 145                                  CONCLUSION

¶ 146 For the reasons stated above, we affirm the judgment of the circuit court of Cook County. The State's request for fees and costs is denied.

¶ 147 Affirmed.

¶ 148 JUSTICE GORDON, specially concurring:

¶ 149 I concur in the judgment and with the majority's opinion. I write separately because I must respectfully disagree with the majority's finding that the invited error doctrine does not apply to the jury-note issue.

¶ 150 At 6:24 p.m., the jurors began their deliberations. At 8:13 p.m., less than two hours later, the jurors sent out a note, stating: "Can self-defense be a mitigating factor? (Definition of mitigating factor is unclear on sheet)." After discussing the note with the attorneys from both sides, the trial court sent back a response stating, "you heard the evidence, you have the instructions of law. Please continue to deliberate." The following morning, after the jurors had reconvened, they reached a verdict, finding defendant guilty of first degree murder.

¶ 151 On appeal, defendant claims that the trial court committed plain error when it failed to clarify further the law of self-defense in response to the jury's note. Defendant argues that "how the jury would consider self-defense in relation to first- and second-degree murder was the decisive issue in the case."

¶ 152 The jurors were properly instructed on the law of self-defense, and how it related to first and second degree murder, before they retired to deliberate, and defendant does not claim on appeal that the original instructions were improper.

¶ 153 After receipt of the note, the ASA observed that "they're aware of the instructions, that they're find[ing] it confusing." The trial court agreed, stating that it found the pattern instructions on this issue "confusing, and I've been doing this for you know, 30 years." Thus, further explanation would have required the trial court to go outside of the pattern instructions,

and neither the State nor the defense sought or tendered a nonpattern instruction. The trial court observed that, while it "could refer them to the definition of mitigating factor," they already "kn[e]w about it." The jury note itself indicated that the jurors were well aware of the "[d]efinition of mitigating factor" that was "on [the] sheet" given to them. The trial court expressed the concern that giving them more than the pattern instructions was tantamount "to giv[ing] them an answer that's going to infer a verdict."

¶ 154    Defense counsel suggested the following response: "you can instruct them on the law, please continue your deliberations. You have all the evidence and the instructions under the law." When the trial court observed that "the standard response" would be to refer them to the pattern instructions defining murder and mitigating factor, defense counsel stated: "And what about self-defense?" That is when the ASA observed that the jurors were clearly aware of the pattern instructions that they had received and had found the pattern instructions confusing. The trial court then decided to give, in essence, the response that the defense had originally proposed: "you heard the evidence, you have the instructions of law. Please continue to deliberate." Neither attorney objected.

¶ 155    On appeal, defendant does not argue that the pattern instructions on these issues were improper, and he did not ask to provide the jurors with the nonpattern explanation that they were seeking. The trial court's response echoed, almost word-for-word, what defense counsel had proposed.

¶ 156    A party cannot invite an error by the trial court and then use it as a basis for appeal. "Under the invited-error doctrine, a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Manning*, 2017 IL App (2d) 140930, ¶ 16; see also *People v. Cox*, 2017 IL App (1st) 151536, ¶ 73; *People v. Hughes*, 2015 IL 117242, ¶ 33 ("the invited error rule" states that "a party cannot complain of error that it brought about or participated in"); *People v. Bush*, 214 Ill. 2d 318, 332 (2005) (when a party "procures, invites or acquiesces" to a trial court's evidentiary ruling, even if the ruling is improper, he cannot contest the ruling on appeal). "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 157    Even if we were to find that the invited error doctrine did not apply and we considered the issue under the plain error doctrine, I agree with the majority, for the reasons stated in its opinion, that the alleged error did not rise to the level of plain error. As the majority already discussed in its opinion, the evidence at trial was overwhelming and therefore did not constitute first-prong plain error. *Supra* ¶¶ 96-98. The victim's mother testified that she observed defendant repeatedly stabbing her son, and the police testified that, when they arrived, defendant was *still* stabbing him. Specifically, Officer Curry testified that, as he reached the bottom of the stairs, he observed that the entryway to the basement "was covered by a curtain or some kind of partition" and he heard what "sounded like to" him was someone "getting stabbed." Curry described the sound as "a squishing, a repeatedly [*sic*] like a chi, chi, chi." After Curry drew his weapon and instructed another officer to pull back the curtain, he observed defendant straddled over the victim, who was not moving. *Supra* ¶¶ 18-19. It is hard to argue self-defense in the face of such evidence. Similarly, the alleged error does not rise to second-prong plain error, as the majority explains (*supra* ¶ 118), where the jury instructions were complete and proper.

¶ 158    In addition, I cannot find that defense counsel's performance constituted ineffective assistance of counsel. First, "what instructions to tender" is generally a matter of trial strategy. *People v. Lowry*, 354 Ill. App. 3d 760, 766 (2004); *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010) (" 'Defense counsel's choice of jury instruction is considered a tactical decision, within the discretion of defense counsel.' " (quoting *People v. Bobo*, 375 Ill. App. 3d 966, 977 (2007))). Our supreme court has instructed its appellate courts to "be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). "[A] mistake in trial strategy" will not, by itself, render representation constitutionally defective. *People v. Peterson*, 2017 IL 120331, ¶ 80.

¶ 159    Second, even if we were to assume that counsel's performance was deficient, defendant cannot establish the second prong of the *Strickland* test: that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a court may dismiss the claim on the prejudice prong alone. See *People v. Peterson*, 2017 IL 120331, ¶ 79; *People v. Cherry*, 2016 IL 118728, ¶ 24; *People v. Flores*, 153 Ill. 2d 264, 283-84 (1992). In the case at bar, defendant cannot establish prejudice where the evidence was overwhelming that he stabbed the victim repeatedly, while remaining virtually unscathed. *Supra* ¶ 98.

¶ 160    In addition, I am not persuaded by the dissent concerning the State's remarks in its rebuttal closing. As the majority opinion explains, the complained-of remarks primarily concerned defendant's prearrest silence (*supra* ¶ 102), and to the extent that some remarks can be construed as referring to postarrest silence, they did not rise to the level of plain error, for the reasons already explained in the majority opinion. *Supra* ¶¶ 96-106. In addition, defendant testified that he told the police that he was acting in self-defense and counsel's remarks may have been for impeachment purposes.

¶ 161    For the foregoing reasons, I concur with the majority opinion.

¶ 162    JUSTICE LAMPKIN, dissenting:

¶ 163    I respectfully dissent. I disagree with the majority's summary of the evidence and plain error analysis regarding the issue of the prosecutor's improper use of defendant's postarrest silence for impeachment purposes. I disagree with the majority's conclusion that defendant has not met his burden to show that the prosecutor's use of defendant's postarrest silence constituted a clear error that was so serious as to deny him a fair trial and challenge the integrity of the judicial process. Furthermore, I reject the State's assertion on appeal that its challenged remarks fall within an exception to the general rule that questions and remarks by a prosecutor regarding a defendant's postarrest silence are improper. I also disagree with the majority's conclusion that a general jury instruction given here—*i.e.*, that closing arguments are not evidence but merely summaries of how the attorneys think the evidence can be interpreted— preempted the jury from considering the improper comments as evidence. I would find that the State's improper recross-examination of defendant and extensive commentary during rebuttal closing argument about his postarrest silence and failure to tell the police that he acted in self-defense were substantial errors that require reversal and a new trial.

¶ 164    Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue subject to *de novo* review. *People v. Wheeler*, 226 Ill. 2d 92,

121 (2007). In reviewing a defendant's claims of prosecutorial misconduct in closing argument, the court considers closing arguments in their entirety in order to place the challenged remarks in context (*People v. Johnson*, 385 Ill. App. 3d 585, 604 (2008)) and "asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *Id.* "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.*

¶ 165      I disagree with the majority's belief that a conflict exists concerning whether a reviewing court should apply an abuse of discretion analysis or *de novo* review to allegations challenging a prosecutor's remarks during closing argument. A careful review of supreme court precedent establishes that no such conflict exists, and the supreme court has applied the two standards of review separately to the appropriate issue addressed on appeal. Specifically, in *People v. Blue*, 189 Ill. 2d 99, 128-34 (2000), the court held that the trial court abused its discretion by permitting the jury to hear the prosecutor's arguments that the jury needed to tell the police it supported them and tell the victim's family that he did not die in vain and would receive justice. In contrast, in *Wheeler*, 226 Ill. 2d at 121-31, the supreme court reviewed *de novo* whether a new trial was warranted based on the prosecutor's repeated and intentional misconduct during closing argument, which involved vouching for police credibility, attacking defense counsel's tactics and integrity, disparaging former defense counsel, and persistently stating that the prosecution was representing the victims. Whereas a reviewing court applies an abuse of discretion analysis to a trial court's determinations about the propriety of a prosecutor's remarks during argument (*Blue*, 189 Ill. 2d at 128), a court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial (*Wheeler*, 226 Ill. 2d at 121). Our supreme court has not created any conflict about the appropriate standard of review to be applied to these two different issues.

¶ 166      According to the record, Officer Curry testified that his gun was drawn when Officer McPherson pulled the curtain open and Curry observed defendant straddled over a motionless Moore. Neither Moore nor defendant said anything to Curry. Curry did not see a weapon in defendant's hand. When Curry raised his gun, defendant and Curry "kind of just looked at each other," and then defendant jumped up and went around to a side of the basement outside of Curry's view. The officers went back up the stairs. Curry's testimony did not mention defendant's silence after Curry raised his gun. Furthermore, Officer Bankhead's testimony did not mention defendant's silence when Bankhead, with his gun pointed at defendant, guided him up the basement stairs.

¶ 167      Defendant testified that he acted in self-defense because Moore had attacked him. Also, defendant said he told Sharp, after she came down to the basement to break up the fight, that she should call the police. Defendant claimed that the police officers never came down the basement stairs and he immediately complied when they told him to come up the stairs.

¶ 168      When the ASA began her recross-examination of defendant, she asked:

> "Q. When you saw the police, you didn't say to them, 'I had to defend myself,' did you?
>
> A. Actually when I came up—yes, I said that yes.

THE COURT: I'm sorry?

A. Yes.

Q. [ASA MS. WARD] The first time you're actually saying that is today in this court, isn't that correct?

A. As far as I mean—

Q. That you had to defend yourself?

A. No.

MR. TYSON [DEFENDANT'S ATTORNEY]: Objection, Judge.

THE COURT: Objection will be sustained."

¶ 169    During rebuttal closing argument, the ASA argued that only Moore asked Sharp for help, defendant's testimony that he asked Sharp for help was a lie, and defendant said nothing when Officers Curry and McPherson came. The ASA argued that a person who killed an attacker in self-defense would shout it from the highest mountain and thank God when the police arrived. Although defense counsel objected, the trial court overruled the objection. The ASA continued, arguing that if the police told a person acting in self-defense to drop the knife, the person would explain to the police that he was defending himself from the attacker but, here, defendant "said nothing to the police" and ran toward the back of the basement. Even after Officer Bankhead arrived and defendant had exited the basement and had "his hands up," defendant did not say "listen, it's a mistake, I am not the one, I am a victim, I was attacked, I had to do it." Nor did defendant tell Sharp to call an ambulance due to this horrible event. The ASA stated, "Yeah, if you were truly justified, if you were truly not guilty, that's what you would do, and that's not what [defendant] did, and that's how you know."

¶ 170    Due process precludes a prosecutor from impeaching a defendant's exculpatory testimony, offered for the first time at trial, by cross-examining the defendant regarding his failure to inform the police of his explanation after he was arrested and had received *Miranda* warnings. *Greer v. Miller*, 483 U.S. 756, 761-63 (1987); *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). Although federal law permits impeachment of a defendant with evidence that he was silent anytime before receiving *Miranda* warnings (*Fletcher v. Weir*, 455 U.S. 603, 605-07 (1982) (*per curiam*)), Illinois evidence principles prohibit impeachment of the defendant with his postarrest silence either before or after receiving *Miranda* warnings (*People v. Quinonez*, 2011 IL App (1st) 092333 ¶ 26). This Illinois rule is based on our supreme court's pre-*Miranda* decisions in *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962), and *People v. Rothe*, 358 Ill. 52, 57 (1934), which held that an accused's silence at the time of his arrest is neither relevant nor material because his exercise of his right to remain silent has no tendency to prove or disprove the charges against him. Because this Illinois rule is based on evidentiary principles rather than constitutional law, the rule is unaltered by the holdings in federal cases that the use of a defendant's pre-*Miranda* silence is not a constitutional violation of the defendant's due process rights. See *Fletcher*, 455 U.S. at 607; *People v. Homes*, 274 Ill. App. 3d 612, 619-20 (1995).

¶ 171    There are limited situations where a defendant's postarrest silence may be used for impeachment purposes. If the defendant testifies at trial to an exculpatory version of events and also claims to have told the police the same version upon arrest, then the State may impeach him with evidence that he did not do so. *Doyle*, 426 U.S. at 619 n.11; *People v. Rehbein*, 74 Ill. 2d 435, 441-42 (1978). Similarly, if a defendant's exculpatory testimony at trial is manifestly inconsistent with voluntary statements he made after his arrest, then comment or

evidence about his failure to give the same statement at that time does not violate the *Doyle* rule. *People v. Frieberg*, 147 Ill. 2d 326, 353-54 (1992); *People v. Beller*, 74 Ill. 2d 514, 522-23 (1979).

¶ 172     Here, the prosecutor improperly questioned defendant regarding his postarrest silence, and her questions did not fall within an exception to the rule against using a defendant's postarrest silence against him. Defendant did not testify on direct examination that he told the police he acted in self-defense, so the prosecutor was not attempting to elicit impeachment when she asked him on recross-examination, "When you saw the police, you didn't say to them, 'I had to defend myself,' did you?" and "The first time you're actually saying that [you had to defend yourself] is today in this court, isn't that correct?" Furthermore, there was no evidence that defendant spoke to the authorities before trial, so the State possessed no statements manifestly inconsistent with his trial testimony that could properly be used for impeachment purposes. Arguably, the prosecutor's first question does not fit neatly within the category of a *Doyle* violation because it may refer to a time before defendant received the *Miranda* warnings. I believe, however, that the prosecutor's follow-up question clearly constitutes a *Doyle* violation because it refers to a time period that includes defendant's formal arrest, during which he would have received the *Miranda* warnings.

¶ 173     Although the trial court sustained defense counsel's late objection to this questioning, the jury was never given a curative instruction. Furthermore, the improper recross-examination of defendant was later compounded by the prosecutor's extensive comments during rebuttal closing argument about defendant's postarrest silence. Although defense counsel timely objected to the prosecutor's initial improper remark, the trial court overruled the objection and the prosecutor continued her line of argument by impersonating what a person who acted in self-defense would have said to the police at the scene. The prosecution is given wide latitude in closing arguments, but this latitude is not so wide as to encompass these improper comments regarding defendant's postarrest silence. *People v. Simmons*, 293 Ill. App. 3d 806, 813 (1998).

¶ 174     Defendant forfeited review of this issue by failing to both timely object and include the issue in his posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)); however, he seeks review under both prongs of the plain error doctrine or, alternatively, as a claim of ineffective assistance of counsel. Although I would not find that the evidence in this case was closely balanced, I would find that a clear error occurred and defendant met his burden to show the error was so serious as to deny him a fair trial and challenge the integrity of the judicial process. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005). In *People v. Dameron*, 196 Ill. 2d 156, 163-66 (2001), the court, in the context of determining whether a *Doyle* violation was harmless error, considered (1) the party who elicited the testimony about the defendant's silence, (2) the intensity and frequency of the references to the defendant's silence, (3) the use that the prosecution made of the defendant's silence, (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction, and (5) the quantum of other evidence proving the defendant's guilt. I believe these same factors are helpful in the context of plain error analysis.

¶ 175     Here, the prosecution elicited the testimony about defendant's silence and made frequent and forceful references to his silence to damage his credibility and undermine his claim of self-defense, factors which were critical to his defense. The issue of second degree murder, which is a lesser mitigated offense of first degree murder, was before the jury, so the jury had to decide whether defendant thought he was defending himself during the struggle with Moore

even if defendant's belief was unreasonable. Furthermore, the jury never received any curative instruction about the improper use of defendant's postarrest silence. Accordingly, the jury may have deemed it appropriate to consider defendant's postarrest silence during the jury's deliberations because the trial court overruled defense counsel's objection to the prosecutor's improper remarks during rebuttal closing argument about defendant's postarrest silence. Under these circumstances, the State's improper cross-examination and rebuttal argument about defendant's postarrest silence impinged upon his substantial right to remain silent. Accordingly, defendant should not be held to his forfeiture of this issue.